IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>American Classic Voyages Co., *et al.*,<br><br>Debtors. | Case No. 01-10954 (EIK)<br><br>Chapter 11<br><br>Jointly Administered<br><br>**Hearing Date: December 19, 2001 at 2:00 p.m.**<br>**Objection Deadline: December 14, 2001 at 4:00 p.m.** |

## APPLICATION OF DEBTORS AND DEBTORS-IN-POSSESSION FOR AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF CHANIN CAPITAL PARTNERS L.L.C. AND AMERICAN MARINE ADVISORS AS OF NOVEMBER 19, 2001 AS FINANCIAL ADVISORS FOR THE DEBTORS

American Classic Voyages Co. ("AMCV" or the "Company") and the other debtors and debtors-in-possession in the above-captioned cases (the "Debtors") hereby apply (the "Application") to the Court for the entry of a retroactive order authorizing the Debtors to retain and employ Chanin Capital Partners L.L.C. and American Marine Advisors (collectively, "Chanin/AMA"), effective as of November 19, 2001, as financial advisors for the Debtors in connection with the Debtors' chapter 11 cases and the proposed restructuring of the Debtors' businesses as further described herein and the Debtors' indebtedness, including the analysis, consideration and development of a chapter 11 plan of reorganization. In support of this Application, the Debtors rely on the Affidavit of Russell Belinsky of Chanin Capital Partners L.L.C. sworn to on December 3, 2001 (hereinafter the "Belinsky Affidavit"). In further support of this Application, the Debtors respectfully represent as follows:

## Introduction

1. On or about October 19, 2001 (the "Petition Date"), AMCV and its affiliates commenced their reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). On November 1, 2001, the United States Trustee appointed an Official Committee of Unsecured Creditors in the above-captioned cases. The Debtors are continuing in possession of their respective properties and are operating their respective businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order dated September 6, 2001 by the United States District Court for the District of Delaware automatically referring chapter 11 cases in this District to the United States Bankruptcy Court for the District of Delaware. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. The statutory predicates for the relief sought herein are sections 327 and 328 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4. AMCV is the largest U.S.-flag cruise company and markets two distinct products that cruise in Hawaii, one product that cruises along the coast of North America and one product that cruises on America's inland waterways. AMCV's cruise lines, United States Lines, American Hawaii Cruises, Delta Queen Coastal Voyages and Delta Queen Steamboat Company

operate a total of seven U.S.-crewed vessels with a combined 3,480 berths. Three more ships, with a total of 4,024 berths, are in production at U.S. shipyards.

5. Over the last decade, the worldwide cruise market grew at an extremely rapid pace as cruise lines added new and increasingly larger ships to the market. The Debtors achieved success in this competitive industry as a niche operator through a focused marketing strategy aimed at their target customers. AMCV also established a growth strategy designed to add new and unique vessels and strengthen a well-established reputation and position in the market.

6. Like the rest of the travel industry, the Debtors were negatively affected by the slowing economy in 2001 and were impacted by very aggressive pricing competition in the cruise industry. Prior to the September 11, 2001 terrorist attacks, AMCV had restructured a large amount of its non-operational cash obligations, pared its operating costs and had taken sales and marketing steps that led to fully occupied vessels at increasing yields. The aftermath of the terrorist acts and the war on terrorism had a dramatic effect on the Company's financial health. Since the events of September 11, 2001, AMCV's bookings have slowed dramatically, its cancellations increased and its liquidity declined sharply as access to bank credit lines and working capital became sharply restricted.

7. Other cruise lines and travel industry companies also have been affected by the post-September 11 climate. On September 26, 2001, Renaissance Cruise Lines filed for bankruptcy protection in the federal courts in Florida. The press has noted the Renaissance filing because of the immediate cessation of business that occurred, including the claimed stranding of customers and employees.

3

8. Absent any prospects for any material improvement or access to additional funding for the next several months, the Company decided to file for bankruptcy protection. The Debtors have determined that a significant reduction of operations will permit the Debtors to stem the present cash outlays and to preserve the value of their assets for the benefit of creditors. On or immediately prior to the commencement of these cases, AMCV ceased operations on six of its seven vessels, while continuing operations on the Delta Queen riverboat, a National Historic Landmark, during its normal operational schedule. The Company plans to resume the operations of the Mississippi Queen as scheduled in the Spring of 2002. These boats are well recognized in the cruise industry and are popular with AMCV's customers. The same management team who made the Delta Queen brand successful in the past is committed to re-building its value going forward.

9. The Debtors have made significant efforts to provide for an orderly cessation of operations on their six vessels and as set forth in more detail in the various requests for first-day relief submitted by the Debtors, have attempted to ensure that the cruises would be completed and that all passengers would be safely returned to their scheduled port of departure. Moreover, the Debtors have attempted to protect their employees, including those that have been necessarily displaced by an unexpected end to their scheduled work rotation.

10. The Company intends to work with Northrop Grumman Corporation, the shipyard building its new Hawaii vessels, and the U.S. Maritime Administration with the goal to continue construction on these large passenger ships. The Debtors continue to believe the Hawaii cruise market holds great potential in the future. The Debtors remain committed to their underlying business model, and plan to return to the roots of their business with the Delta Queen

4

Steamboat Company, while at the same time continuing to plan for the future potential of the Hawaii cruise market. The Debtors believe this will allow them to leverage their key competitive advantages, as they rebuild to historical levels the cash flow from the Delta Queen franchise of riverboats sailing in the heartland of the U.S. and maintain construction of the first modern American cruises ships to be built in 50 years which will sail around the Hawaiian islands beginning in 2004.

## Relief Requested

11. By this Application, the Debtors request that the Court enter an order substantially in the form of the proposed order accompanying this Application authorizing the Debtors to employ and retain Chanin/AMA as financial advisors for the Debtors, effective as of November 19, 2001, with regard to the matters described below, pursuant to sections 327(a) and 328 of the Bankruptcy Code.

12. No previous request for the relief sought herein has been made to this or any other court.

## Services to be Provided by Chanin/AMA

The Debtors wish to retain Chanin/AMA to provide the Debtors with financial advisory services in connection with the Debtors' Chapter 11 cases and the proposed restructuring of the Debtors' Delta Queen Steamboat Co. and Delta Queen Coastal Voyages businesses (the "Businesses") and the Debtors' indebtedness, including the analysis, consideration and development of a chapter 11 plan of reorganization.

5

13. The Debtors contemplate that the engagement of Chanin/AMA will involve, without limitation, the structuring and marketing of the Debtors' assets pursuant to a sale under section 363 of the Bankruptcy Code and the recapitalization of the Debtors' indebtedness.

14. After substantial arms-length negotiations between the Debtors and Chanin/AMA, and with input from the Creditors' Committee as to the terms of Chanin/AMA's engagement, the Debtors have entered into an engagement letter with Chanin/AMA (the "Engagement Letter") (attached hereto as Exhibit A and incorporated herein by reference). The scope of Chanin/AMA's proposed retention under sections 327(a) and 328 of the Bankruptcy Code and pursuant to the Engagement Letter, is anticipated to include, among other things, the following:[1]

    a. Review and analyze the financial and operating statements of the Debtors;

    b. Evaluate the assets and liabilities of the Debtors;

    c. Review and analyze the Debtors' business and financial projections;

    d. Assist and advise the Debtors in identifying, approaching and negotiating with potential lenders or acquirers or plan sponsors a transaction;

    e. Assist in the determination of an appropriate capital structure for the Debtors;

    f. Determine a theoretical range of enterprise values for the Debtors on a going concern basis;

    g. Assist and advise the Debtors in structuring the auction process and bidding procedures;

---

[1] To the extent terms of the Engagement Letter are set forth in this Application, such recitation is for demonstrative purposes only and shall not be deemed to alter the actual terms of the Engagement Letter, which shall govern retention of Chanin/AMA, if approved.

6

h.  Advise the Debtors on tactics and strategies for negotiating with the holders of the existing debt obligations (the "Creditors") and other stakeholders;

i.  Render financial advice to the Debtors and participate in meetings or negotiations with the Creditors and other stakeholders in connection with any restructuring, modification or refinancing of the Debtors' existing debt obligations; and

j.  Provide the Debtors with other appropriate general restructuring advice, including attending Board of Directors meetings and providing testimony, as necessary, in Bankruptcy Court.

15. Upon retention, Chanin/AMA will work at the direction of the Debtors and in conjunction with, and without duplication of, the work of other advisors retained by the Debtors for the above-mentioned matters.

16. The Debtors believe that retention of Chanin/AMA is essential to the reorganization of their Businesses. While the Debtors have meaningful management resources that will complement the skills presented by Chanin/AMA, the Debtors have concluded that Chanin/AMA has substantial resources that will help the Debtors explore and implement the various reorganization and/or sale options that may exist to maximize the value of the Debtors' estates. The retention of Chanin/AMA is designed to assist the Debtors, and all of the constituents interested in the Debtors' estates, identify and execute the plan most likely to provide the maximum return to the Debtors' creditors. Further, the Debtors have discussed Chanin/AMA's retention with the Creditors' Committee and believe that, subject to relatively minor issues with respect to Chanin/AMA's compensation, the Committee supports the retention.

17. The Debtors interviewed several other potential advisors and concluded that the Chanin/AMA was the most qualified and best situated advisor to serve the Debtors'

7

objectives. Chanin Capital Partners, L.L.C. ("Chanin") is a specialty boutique investment banking firm, specializing in providing a wide range of financial services to companies, creditors, and other constituencies in highly leveraged situations. With over 40 professionals and offices in New York and Los Angeles, Chanin is one of the largest advisory firms specializing in this area. Over the past decade, Chanin has assisted in restructuring over $50 billion of public and private debt securities for companies such as TBS Shipping, Enterprise Shipping, Global Ocean, Golden Ocean, Pegasus, Sunterra Corporation, Stone & Webster, Incorporated, Harvard Industries, SpectraVision, Purina Mills, Morrison Knudsen, Bucyrus Erie and Sun Healthcare. Chanin provides traditional investment banking and corporate finance services, and merger and acquisition services, as well.

18. American Marine Advisors ("AMA") is the only investment banking firm in the United States exclusively focused on the maritime industry. As a result, AMA is uniquely positioned to bridge the limited coverage of the shipping industry by the traditional Wall Street firms and meet the ongoing capital needs of its global maritime clientele. Over the last 14 years, AMA has arranged in excess of $6 billion in funding for maritime transactions.

19. Together, Chanin and AMA provide an integrated solution for the Debtors' estates, providing two disciplines from the leading firms in their respective fields. The professionals of Chanin and AMA have the industry contacts, information resources and the ability to develop creative solutions to maximize value. The Debtors therefore believe that the retention of Chanin/AMA is in the best interests of the Debtors' estates.

20. For the foregoing reasons, the Debtors believe that Chanin/AMA's employment will be in the best interest of the Debtors, their estates and creditors. Because of the

foregoing, the Debtors believe that Chanin/AMA is well qualified to represent the Debtors in these cases in a cost-effective and efficient manner.

## Disclosure Concerning Conflicts of Interest

21. Based upon the Belinsky Affidavit, the Debtors believe that, except as set forth therein, Chanin/AMA does not hold or represent any interest adverse to the Debtors, and that Chanin/AMA is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

22. Based upon the Belinsky Affidavit, the Debtors believe that Chanin/AMA has no connection with the Debtors, the Debtors' affiliates, the Debtors' attorneys, the Debtors' other professionals, the Debtors' officers and directors, the Debtors' affiliates' officers and directors, the Debtors' major shareholders, the Debtors' beneficial owners, the Debtors' secured lender, the indenture trustees, the Debtors' twenty (20) largest unsecured creditors, the parties to the Debtors' significant executory contracts or leases, the Debtors' other significant parties in interest, the bankruptcy judges and visiting judges for the District of Delaware, the United States Trustee for Region 3 (the judicial district within which the above-captioned cases are pending), the Assistant United States Trustees for Region 3, or any staff attorney in the United States Trustee's office, except as set forth in the Belinsky Affidavit.

23. A statement of the compensation paid for services to be rendered in contemplation of or in connection with this case by Chanin/AMA, and the source of such compensation, is included in the Belinsky Affidavit.

24. The Debtors believe that the employment of Chanin/AMA would be in the best interests of the Debtors and their estates and desire to employ Chanin/AMA under the fee structure detailed in the Engagement Letter and described below.

25. No prior application for the relief requested herein has been made by the Debtors to this or any other court.

### Proposed Compensation of Chanin/AMA

26. As set forth in the Engagement Letter, the Debtors shall pay Chanin/AMA a fee of $125,000 per month (the "Monthly Fee") for the term of the engagement (minimum of three months), payable in advance on the first day of each month; plus a financing fee, which shall be 1.0% of any new senior secured bank debt placed (including any DIP financing), 3.5% of any new mezzanine or subordinated debt placed and 5.0% of any equity financing placed; plus a recapitalization fee, which shall be 75 basis points (0.75%) of the principal amount of the total Existing Debt Obligations restructured, which shall consist of all bank debt (unless refinanced), all ship Financing Notes and Mortgages (unless refinanced) and all other general unsecured debt obligations (the "Recapitalization Fee"); plus merger and acquisition fees, which shall be 1.50% of the first $100 million of Aggregate Consideration and 1.0% of the Aggregate Consideration of the Businesses in excess of $100 million (the "Merger and Acquisition Fee") plus reasonable out-of-pocket expenses incurred in connection with Chanin/AMA's engagement. Chanin/AMA shall credit against the Recapitalization Fee or the Mergers and Acquisitions Fee 50% of the Monthly Fee earned beginning in the third month. The Recapitalization Fee will be credited against the Merger and Acquisition Fee and vice versa. The total fees paid to Chanin/AMA shall be capped at $4 million.

27. The Debtors shall pay the Monthly Fee for the *pro rata* portion of the month of November 2001 occurring on and after November 19, 2001 and the Monthly Fee for December 2001 on or before December 3, 2001. For each successive month, the Debtors shall pay the Monthly Fee in advance on the first day of each month, plus reimbursement for reasonable and documented out-of-pocket expenses for each month. The out-of-pocket expenses will include, but will not be limited to, all reasonable travel expenses, computer and research charges, messenger services and long-distance telephone calls incurred by Chanin/AMA in connection with the services to be provided to the Debtors. Chanin/AMA's employment can be terminated upon twenty (20) days prior written notice, subject to the approval of the Bankruptcy Court.

28. Chanin/AMA intends to apply to the Court for payment of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the guidelines promulgated by the Office of the United States Trustee and the local rules and orders of this Court, and pursuant to any additional procedures that may be or have already been established by the Court in these cases. The Debtors request that the Court retain jurisdiction with respect to any dispute arising with respect to the payments to Chanin/AMA under this Application or the other terms of Chanin/AMA's employment set forth herein.

### Notice

29. No trustee or examiner has been appointed in the Debtors' chapter 11 cases. Copies of this Motion, the proposed order and all exhibits thereto will be provided to the United States Trustee, counsel to the Creditors' Committee and Chanin/AMA. Notice of this

11

#6942 v1 - Revised Chanin Retention [W97]

Motion will be provided to each of the other parties on the Limited Service List. The Debtors submit that under the circumstances no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the proposed order accompanying this Application: (a) authorizing the Debtors to retain Chanin/AMA, effective as of November 19, 2001; and (b) granting such further relief as is just and proper.

Dated: Wilmington, Delaware
December 4, 2001

**WALSH, MONZACK AND MONACO, P.A.**

*/s/ Rachel B. Mersky*
Francis A. Monaco, Jr. (No. 2078)
Joseph J. Bodnar (No. 2512)
Rachel B. Mersky (No. 2049)
1201 Orange Street, Suite 400
Wilmington, Delaware 19801
(302) 656-8162

-and-

David S. Heller
Josef S. Athanas
Timothy A. Barnes
LATHAM & WATKINS
Suite 5800 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606
(312) 876-7700

Attorneys for the Debtors and
Debtors-in-Possession